**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| VOLKSWAGEN GROUP OF AMERICA, INC., | ) ) ) | |
| Plaintiff, | ) ) | No. 22-cv-7045 |
| v. | ) ) | Judge John J. Tharp, Jr. |
| ILLINOIS SECRETARY OF STATE ALEXI GIANNOULIAS, in his official capacity, *et al*., | ) ) ) ) | |
| Defendant. | ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Volkswagen Group of America, Inc. challenges the constitutionality of an amendment to the Illinois Motor Vehicle Franchise Act, 815 ILCS 710/1 *et seq*. ("MFVA"), enacted by the Illinois legislature in 2022. Like similar statutes in other states, the MVFA structures and regulates relationships among motor vehicle manufacturers, wholesalers, distributors, franchisees, and dealers. In general, under the statute, the dealerships that sell and service new motor vehicles are independent from the "legacy" manufacturers that produce them. Newer entrants to the market, such as certain electric vehicle manufacturers without preexisting dealer networks, however, are permitted to sell vehicles directly to customers.

New and certified-pre-owned vehicles also come with manufacturer-provided limited warranties. Since legacy manufacturers such as Volkswagen are not permitted to operate service centers at their Illinois dealerships, the dealers are required to conduct those warranty repairs on customers' vehicles themselves. And since the dealers are independent from the manufacturers but still obligated to perform services for customers related to the manufacturer-provided limited warranties, the manufacturers must reimburse them for that work.

In 2022, Illinois amended the section of the MVFA that governs the terms of those reimbursements, Section 6. 815 ILCS 710/6. Plaintiff Volkswagen contends that the 2022 amendment, known as the "Multiplier Act," resulted in a framework that unduly burdens interstate commerce and violates its property, due process, equal protection, and free speech rights under the U.S. and Illinois constitutions. Volkswagen seeks a declaratory judgment to that effect and to enjoin the defendants from enforcing the 2022 amendment's key provisions.

The defendants, the Illinois Secretary of State, the Illinois Attorney General, and members of the Illinois Motor Vehicle Review Board, have moved to dismiss the complaint, arguing that the Multiplier Act survives rational basis review, does not restrict Volkswagen's speech, does not discriminate against or unduly burden interstate commerce, is not an uncompensated taking, and is not amenable to review under the Illinois Constitution by a federal court pursuant to the Eleventh Amendment. The defendants also offer an interpretation of the challenged amendment that the parties generally agree avoids most of the constitutional issues raised by Volkswagen. The Alliance for Automotive Innovators, a trade association and lobbying group, has filed an *amicus curiae* brief in support of Volkswagen's position. For the reasons that follow, the defendants' motion to dismiss is granted.

## **BACKGROUND**

### *The MVFA*

Illinois has an elaborate statutory framework regulating the sale and servicing of new motor vehicles within the State. Important elements date back to 1979 when Illinois enacted the MVFA. The MVFA "is comparable to legislation adopted by a number of states designed to protect existing dealers and consumers from the negative impact of aggressive franchising practices by automobile manufacturers whose desires to establish excessive competing franchises are considered to be a

potential threat to the public welfare." *Gen. Motors Corp. v. State Motor Veh. Rev. Bd.*, 862 N.E.2d 209, 215-16 (Ill. 2007).

It is unnecessary to delve too deeply into the various aspects of the MVFA and Article I of the Illinois Vehicle Code, pertaining to new and used vehicle dealers, 625 ILCS 5/1-100 *et seq*. For purposes of this case, it is enough to know that the statutory framework generally results in a situation where "Illinois consumers purchase most brands of new passenger cars and light-duty trucks from authorized, independently owned dealers that acquire the vehicles wholesale from manufacturers or distributors." Compl. ¶ 32. "A dealer cannot obtain a license to sell a particular brand or 'line-make' of new vehicles (*e.g.*, Chevrolet, Ford, Jeep, Volkswagen, Toyota, etc.) unless it has a written agreement with the manufacturer or distributor of that line-make. These business arrangements between manufacturer and dealer are commonly referred to as 'franchises.' There are approximately 700 such 'franchise' dealerships in Illinois, including 28 Volkswagen and 12 Audi dealerships." Compl. ¶ 33 (citing 625 ILCS 5/5-101(b)(4)).

For example, plaintiff Volkswagen Group of America, Inc., "acquires Volkswagen and Audi vehicles from its German parent company, Volkswagen AG, and distributes those vehicles in the U.S., including by wholesaling them to authorized dealers in Illinois." Compl. ¶ 31, n.1. Thus, Illinois consumers do not buy their Volkswagen or Audi vehicles directly from Volkswagen or Audi but rather from the 40 Illinois franchisee dealers referenced above.[1] They also go to those dealers for servicing under their Volkswagen-provided limited warranties.

---

[1] The distinction between parent-manufacturer Volkswagen AG and subsidiary-distributor Volkswagen Group of America, Inc. is not pertinent to this case. The latter, Volkswagen Group of America, is, for the Court's purposes, just "Volkswagen." (Volkswagen Group of America is also referred to as "VWGoA" in select quotations throughout this Memorandum.)

Effective January 1, 2022, the "Multiplier Act," HB3940, Public Act 102-0232, amended certain aspects of Section 710/6 of the MVFA. "Section 6, as a whole, pertains to automotive warranty agreements and warranty repairs, and attempts to strike a balance regarding the issue of reimbursement as between manufacturers that sponsor these agreements and their dealers that are required to complete the repairs." *Nissan N.A., Inc. v. Motor Veh. Rev. Bd.*, 7 N.E.3d 25, 28 (Ill. App. 1st Dist. 2014). As *amicus curiae*, the Alliance for Automotive Innovation explains: "There are three primary dynamic components of warranty reimbursement: (1) the markup percentage applied to parts, (2) the hourly labor rate, and (3) the amount of labor time." Br. For AAI as *amicus curiae*, 6, ECF No. 33-1. In simple terms, Total Warranty Reimbursement = Parts + (Labor Rate x Labor Time). The hourly labor rate for a given warranty repair was, and following the amendment remains, equivalent to the rates charged by dealers for "like service" to retail customers, *i.e.*, what the dealers would charge customers for non-warranty service and repairs. The primary focus of this case is on component number 3, the amount of labor time for which Volkswagen would be obligated to compensate Illinois dealers following warranty repairs.

### Section 6 of the MVFA Prior to Amendment

Prior to amendment, Section 6 of the statute required manufacturers such as Volkswagen to compensate dealers for warranty work based in part on reference to a "Uniform Time Standard Manual," which the old version of the statute defined as "a document created by a franchiser that establishes the time allowances for the diagnosis and performance of warranty work and service. The allowances shall be reasonable and adequate. . . ." 815 ILCS 710/6(g)(5) (amended 2022).[2] The statute further required the establishment of fair processes for dealers/franchisees to object

---

[2] Other "reasonable and adequate" compensation requirements existed with respect to labor rates and for parts, though, again, the changes to those requirements are not at issue.

and request modifications to those manuals. *Id.* Accordingly, manufacturers such as Volkswagen promulgated time guides, which contained the manufacturers' estimated labor times for various individual repair operations. As Volkswagen puts it:

> To determine Warranty Flat Rate Time for each individual repair operation, VW AG retains an independent, expert testing company to evaluate, test, and determine the "basic time" required for each repair operation using a "working hours analysis." VW AG then adds "process time," "equipping time," and "distribution time" to the basic time to arrive at a total time for each repair operation. Warranty Flat Rate Time for each repair operation thus includes the time needed for set-up, standard diagnosis, and repair procedures.
>
> In addition, VWGoA adjusts warranty labor reimbursement claims for "exceptional conditions," including, for example, "additional repair steps," a "missing labor operation," or "diagnosis time." For such exceptional conditions, dealers may use the actual "punched time" or "A-time," which is the total clocked time a technician works on a repair.

Compl. ¶ 48.

Volkswagen contends that this methodology ensured that "Illinois Dealers generally receive[d] at least full compensation" for warranty repairs. Compl. ¶ 48. It explained further:

> If a technician's *actual* labor time is *less than* the Warranty Flat Rate Time, VWGoA nonetheless pays the Illinois Dealers its applicable labor rate for the Warranty Flat Rate Time. If, on the other hand, the technician's *actual* labor time *exceeds* the Warranty Flat Rate Time for a legitimate reason, or if no Warranty Flat Rate Time exists for a particular repair operation, the dealer may request payment at the applicable labor rate for the actual time spent. . . . On average, VWGoA has received only a few such challenges each year despite tens of thousands of warranty service repair orders completed annually by the Illinois Dealers.

Compl. ¶¶ 50-52 (emphasis in original). According to its complaint, "no Illinois Volkswagen or Audi Dealer has ever filed an action either with the [Illinois Motor Vehicle Review] Board or a court contending that the time allowances that [Volkswagen] uses to compensate dealers for warranty repairs are either unreasonable or inadequate." Compl. ¶ 53.

5

### *The Multiplier Act*

In 2022, in a statute known as the "Multiplier Act," the Illinois legislature modified the labor rate reimbursement process outlined above by amending Section 6. The plaintiff's complaint focuses on the following portions of Section 6, as amended by the Multiplier Act:

> Sec. 6. Warranty agreements; claims; approval; payment; written disapproval.
>
> (a) Every manufacturer, distributor, wholesaler, distributor branch or division, factory branch or division, or wholesale branch or division shall properly fulfill any warranty agreement and adequately and fairly compensate each of its motor vehicle dealers for labor and parts.
>
> (b) Adequate and fair compensation requires the manufacturer to pay each dealer no less than the amount the retail customer pays for the same services with regard to rate and time.
>
> Any time guide previously agreed to by the manufacturer and the dealer for extended warranty repairs may be used in lieu of actual time expended. In the event that a time guide has not been agreed to for warranty repairs, or said time guide does not define time for an applicable warranty repair, the manufacturer's time guide shall be used, multiplied by 1.5.
>
> In no event shall such compensation fail to include full compensation for diagnostic work, as well as repair service, labor, and parts. Time allowances for the diagnosis and performance of warranty work and service shall be no less than charged to retail customers for the same work to be performed. . . .
>
> In no event shall compensation to a motor vehicle dealer for labor times and labor rates be less than the rates charged by such dealer for like service to retail customers for nonwarranty service and repairs. . . .
>
> There shall be no reduction in payments due to preestablished market norms or market averages. Manufacturers are prohibited from establishing restrictions or limitations of customer repair frequency due to failure rate indexes or national failure averages. . . .

> Manufacturers are not permitted to impose any form of cost
> recovery fees or surcharges against a franchised auto dealership for
> payments made in accordance with this Section.

815 ILCS 710/6; Compl. ¶¶ 66-74.

In particular, Volkswagen challenges Section 6(b)'s 1.5x multiplier—"In the event that a time guide has not been agreed to for warranty repairs, or said time guide does not define time for an applicable warranty repair, the manufacturer's time guide shall be used, multiplied by 1.5." (hereafter, the "1.5x Multiplier Provision")—and its prohibition against cost recovery fees— "Manufacturers are not permitted to impose any form of cost recovery fees or surcharges against a franchised auto dealership for payments made in accordance with this Section." (hereafter, the "Recoupment Bar")—as unconstitutional.

Volkswagen's complaint notes that the Multiplier Act contains no statement of purpose. The legislative history, though sparse, "indicates that some proponents of the Multiplier Act," such as Governor Pritzker and State Senator Belt, "sought the amendments purportedly to increase compensation for vehicle service technicians." Compl. ¶¶ 75-79.

Volkswagen's complaint and the Alliance for Automotive Innovation's brief as *amicus curiae* outline the economic effects the Multiplier Act has had on legacy auto manufacturers such as Volkswagen. They both note that certain electronic vehicle manufacturers, such as Rivian and Tesla, are exempt from many of the MVFA's requirements, because the MVFA permits them to sell and service new vehicles themselves without independent dealer networks as intermediaries. Thus, the Multiplier Act's changes only directly affect how legacy manufacturers with dealer networks such as Volkswagen do business in Illinois.

## ANALYSIS

The complaint sets out multiple legal theories in support of its claims regarding the Multiplier Act's 1.5x Multiplier Provision and Recoupment Bar. Volkswagen contends that, by

depriving it of its property through the 1.5x Multiplier Provision and preventing it from recouping those costs through the Recoupment Bar, the Multiplier Act constitutes (1) an uncompensated taking in violation of the Takings Clause of the U.S. Constitution, U.S. Const. amends. V and XIV; (2) legislation that discriminates against, or, alternatively, unduly burdens, interstate commerce in violation of the Commerce Clause of the U.S. Constitution, U.S. Const. art I, § 8, cl. 3; (3) an arbitrary interference with its property rights that is not rationally related to a legitimate government interest in violation of Volkswagen's due process rights under the Constitution, U.S. Const. amends. V and XIV; and (4) a denial of Volkswagen's constitutional rights to equal protection under the law due to its differential treatment of legacy and EV manufacturers. Moreover, as an alternative to its Takings and Commerce Clause theories, Volkswagen asserts that, to the extent that the Recoupment Bar prohibits it from recovering the increased costs of warranty repairs under the legislation through fees and surcharges, the Multiplier Act infringes on Volkswagen's First Amendment right to communicate to consumers about the nature of the increased prices of its vehicles. Volkswagen's complaint also sets forth multiple counts under the Illinois Constitution, some of which are counterparts to the federal constitutional theories. As for relief, Volkswagen seeks declarations that the Multiplier Act is unconstitutional and to enjoin the defendants from enforcing its provisions against Volkswagen.

Defendants Illinois Secretary of State Alexi Giannoulias in his official capacity, Illinois Attorney General Kwame Raoul in his official capacity, and the members of the Illinois Motor Vehicle Review Board (Bruce Adelman, Mary Awerkamp, Roger McGinty, Terrence O'Brien, Frank Olivo, Lyle Richmond, and Daniel Stephens) in their official capacities, have moved to dismiss the complaint for lack of standing and failure to state a claim for which relief can be granted under the U.S. Constitution. They have also moved to dismiss the state law claims on the

grounds that the Eleventh Amendment bars federal courts from hearing state law claims against state officials in their official capacities. Volkswagen does not object to the dismissal of its state law claims. Therefore, the Court dismisses them without prejudice and proceeds with analysis of the defendants' motion to dismiss Volkswagen's federal constitutional claims.

To survive a motion to dismiss for failure to state a claim, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Kaminski v. Elite Staffing, Inc.*, 23 F.4th 774, 776 (7th Cir. 2022) (quoting Fed. R. Civ. P. 8(a)(2)). A plaintiff need not plead facts corresponding to every element of a legal theory. *Chapman v. Yellow Cab Cooperative*, 875 F.3d 846, 848 (7th Cir. 2017). Instead, the plaintiff need only plead a plausible claim. *Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792, 800 (7th Cir. 2018). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009)). In deciding a motion to dismiss, the Court accepts the well-pleaded factual allegations in the plaintiff's complaint as true, "drawing all reasonable inferences in his favor." *Id.*

I.    **Due Process**

The complaint asserts that the Multiplier Act violates the Due Process Clause of the U.S. Constitution because it deprives Volkswagen of property in an arbitrary manner that is not rationally related to a legitimate government interest.[3] The 1.5x Multiplier Provision is, according to Volkswagen, essentially a forced property transfer from it to Illinois dealers, which are a

---

[3] Volkswagen suggests that its complaint is sufficient to state both facial and as-applied challenges. *See* Pl.'s Resp. at 28 ("[W]hile these allegations plausibly allege a facial due process claim, the Complaint also alleges facts showing that the Multiplier Act violates due process as applied to VWGoA, because VWGoA adequately compensates the Illinois Dealers for warranty work.").

powerful interest group in the state. And Volkswagen alleges the multiplier has already cost Volkswagen millions of dollars.

Volkswagen faces "an extraordinary and perhaps insuperable burden" in mounting its substantive due process challenge to the Multiplier Act, a purely economic regulation. *C. States, S.E. and S.W. Areas Pension Fund v. Lady Baltimore Foods, Inc.*, 960 F.2d 1339, 1343 (7th Cir. 1992). "The courts review economic regulations with a strong presumption of constitutionality. The challenger must show that a legislature has acted in an arbitrary and irrational way." *C. States, S.E. and S.W. Areas Pension Fund v. Midwest Motor Exp., Inc.*, 181 F.3d 799, 806 (7th Cir. 1999). The rational basis test applies. *Minerva Dairy, Inc. v. Harsdorf*, 905 F.3d 1047, 1053 (7th Cir. 2018). "Under rational-basis review, a statut[e] comes to court bearing 'a strong presumption of validity,' and the challenger must 'negative every conceivable basis which might support it.'" *Ind. Petroleum Marketers & Convenience Store Ass'n v. Cook*, 808 F.3d 318, 322 (7th Cir. 2015) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314-15 (1993)). Rational basis does not demand an optimal or well-tailored method of furthering the state's goal; the legislature "is not obligated to choose the legislative scheme that a reviewing court would find to be the best or fairest means to the legislative end, but simply one that is rationally related to that end." *Midwest Motor Exp., Inc.*, 181 F.3d at 806. Nor is it necessary for the legislative record to bear out the government's interest in furthering the end; the defendants may supply a rational basis during subsequent litigation. *Id.* ("Economic regulation will be upheld, even without any express findings or legislative history, if there is 'any reasonably conceivable state of facts that could provide a rational basis' for the legislation.") (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993)).

The Rule 12(b)(6) standard does not negate the strong presumption of rationality bestowed upon economic regulations. The analysis in this regard is analogous in both the substantive due process and equal protection contexts. *See Wroblewski v. City of Washburn*, 965 F.2d 452, 458 (7th Cir. 1992) ("If the law at issue has a rational justification, then it passes the [substantive due process] test [for arbitrariness]. . . . Review for nonarbitrariness under the due process clause is, for our purposes, analogous to review for a 'rational basis' under the equal protection clause."). Volkswagen argues that "the Complaint need only raise a 'reasonable inference' that the Multiplier Act is arbitrary." Pl.'s Resp. at 27 (citing *Pittsfield Dev., LLC v. City of Chicago*, No. 17 C 1951, 2017 WL 5891223, at *11 (N.D. Ill. Nov. 28, 2017)). That is not an entirely accurate description of how to square the presumption of rationality with the Rule 12(b)(6) standard. Rather, "[t]o survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to overcome the presumption of rationality. . . ." *Wroblewski*, 965 at 460. "Sufficient to overcome" requires asserting a set of facts that, taken as true, establish that "the facts on which the legislature may have relied in shaping the classification 'could not reasonably be conceived to be true by the governmental decisionmaker.'" *Id.* at 459 (quoting *Sutker v. Illinois Dental Soc'y,* 808 F.2d 632, 635 (7th Cir. 1986)). A "conclusory assertion that [a] policy is 'without rational basis' is insufficient to overcome the presumption of rationality coupled with [a] readily apparent justification for the policy." *Id.* at 460.

### A. Legitimate State Interests

The defendants have identified two legitimate state interests in their motion to dismiss. The first is ensuring fair and adequate compensation for Illinois dealers. They submit that in enacting the Multiplier Act, Illinois officials sought to address the problem "that manufacturers tend to underestimate warranty repair times, so that an adjustment is necessary to ensure that dealers receive fair and adequate compensation." Defs.' Memo. at 6. The Multiplier Act's requirement

that manufacturers and dealers either (1) arrive at mutually agreed labor time guides or (2) resort to the manufacturers' time guides but with a 1.5x multiplier, therefore "ensures that dealers are adequately compensated for warranty work." Defs.' Reply at 3. Indeed, this is consonant with at least one Illinois court's interpretation of Section 6 prior to amendment, which is that it "attempts to strike a balance regarding the issue of reimbursement as between manufacturers that sponsor these agreements and their dealers that are required to complete the repairs." *Nissan N.A., Inc. v. Motor Veh. Rev. Bd.*, 7 N.E.3d 25, 28 (Ill. App. 1st Dist. 2014) (interpreting the 2012 version of Section 6). And according to the Illinois Supreme Court, the MVFA, in general, "has the legitimate purpose of redressing the disparity in bargaining power between manufacturers and their franchisees." *Gen. Motors Corp. v. State Motor Veh. Rev. Bd.*, 862 N.E.2d 209, 228 (Ill. 2007). Volkswagen counters that this is not a legitimate interest because it is merely "a handout to a politically powerful group at the sole expense of other private parties." Pl.'s Resp. at 28. But federal courts have long recognized that states have legitimate interests in addressing perceived disparities in bargaining power among economic actors, including motor vehicle manufacturers and dealers, and any abuses that arise therefrom. *See, e.g.*, *New Motor Veh. Bd. of California v. Orrin W. Fox Co.*, 439 U.S. 96, 107 (1978) ("[T]he California Legislature was empowered to subordinate the franchise rights of automobile manufacturers to the conflicting rights of their franchisees where necessary to prevent unfair or oppressive trade practices. '[S]tates have power to legislate against what are found to be injurious practices in their internal commercial and business affairs, so long as their laws do not run afoul of some specific federal constitutional prohibition, or of some valid federal law. . . . [T]he due process clause is [not] to be so broadly construed that the Congress and state legislatures are put in a strait jacket when they attempt to suppress business and industrial conditions which they regard as offensive to the public welfare.'"

(quoting *Lincoln Union v. Northwestern Co.*, 335 U.S. 525, 536-37 (1949)) (alterations in original)). The Court's task, therefore, is not to question whether those perceived disparities and abuses are grounded in reality or whether they merit remediation through legislation; both questions are for legislators to decide. Rather, in deciding a substantive due process challenge, the Court is tasked with deciding whether the challenged legislation is rationally connected to addressing such problems, an exceedingly low bar.

The second state interest that the defendants submit in support of their motion is ensuring that technicians who work for Illinois dealers and conduct warranty repairs are fairly compensated. They argue that "even if dealers make money from warranty repairs, this does not negate the possibility that manufacturers pay dealers less than they should for those repairs, which in turn causes technicians to be undercompensated for their work." Defs.' Reply at 7. Although it is not necessary to identify this as the ***actual*** reason behind the legislation, both the complaint and memorandum in support of the motion to dismiss refer to state officials' statements indicating that this it is, at least, the ostensible objective. *See, e.g.*, Compl. ¶¶ 75-79; Defs.' Memo. at 6. Volkswagen does not generally dispute that it is a legitimate interest—only that the Multiplier Act is not rationally connected to it.

### B. Rational Bases

Volkswagen contends that Illinois lacked a rational basis for the Multiplier Act because it is not rationally connected to either of the government's purported interests or ends.

Volkswagen does not contend that the amendment cannot rationally be thought to increase the reimbursement amounts received by dealers in exchange for performing warranty work. Rather, Volkswagen claims that it is implausible that Illinois sought to address ***unfair*** reimbursements for Illinois dealers through the Multiplier Act because the status quo ante was fair. It argues that the Court must credit its allegations that it previously adequately reimbursed dealers

13

for warranty repair, and the Multiplier Act's changes thus require Volkswagen to **overcompensate** dealers for those repairs, which is not the government's purported state interest.

It supports that conclusion with the following factual assertions in its complaint:

> (i) [Volkswagen's] time guides accurately determine the time required to complete repairs; (ii) its use of the time guides to compensate dealers for warranty service ensures compensation for at least the amount of time it actually takes to complete a repair (if not more); (iii) the Illinois Dealers may challenge [Volkswagen] Warranty Flat Times (either with [Volkswagen] or administratively) if they believe the time allowances are inadequate, but rarely do so; and (iv) warranty repair work was highly profitable for the Illinois Dealers before the Multiplier Act.

Pl.'s Resp. at 29 (citing Compl. ¶¶ 45-57). Therefore, according to Volkswagen, the legislature could not have had a rational basis in enacting the Multiplier Act to remediate dealer under-reimbursement because there was no under-reimbursement problem to begin with, at least as applied to Volkswagen's relationship with its franchisees and dealers.

But those allegations, taken as true, do not overcome the presumption of rationality by precluding a reasonably conceivable state of affairs where the legislature may have sought to remedy a perceived issue that, in general, manufacturers' time guides resulted in under-reimbursement for dealers even if Volkswagen's in particular did not. As the defendants point out, "rational basis review . . . tolerates underinclusive or overinclusive classifications." Defs.' Reply at 4 (citing *St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist.*, 919 F.3d 1003, 1012 (7th Cir. 2019) ("On rational-basis review, classifications can be both underinclusive and overinclusive and still survive.")). It is well established that "[r]ational-basis review tolerates overinclusive classifications, underinclusive ones, and other imperfect means-ends fits." *St. Joan Antida High Sch. Inc.*, 919 F.3d at 1010 (collecting cases). Volkswagen's "as-applied" framing—supported by only one unpersuasive out-of-circuit precedent, *Clayton v. Steinagel*, 885 F. Supp. 2d 1212 (D. Utah 2012)—is not grounded in doctrine. If it were, "as-applied" substantive due process claims

would be flourishing because, put plainly, it is not uncommon for an economic regulation aimed at solving a problem caused by a group to affect members of the group who were not individually responsible for the problem.

There is also a subtle but important distinction between showing that the Illinois legislature may have been wrong about the existence of the problem and showing that the Illinois legislature could not have rationally perceived that there was a problem. The latter is the factual scenario that Volkswagen's complaint must establish to survive the motion to dismiss its Fourteenth Amendment due process and equal protection claims. *See Zehner v. Trigg*, 133 F.3d 459, 463 (7th Cir. 1997) ("All that is required to uphold the statute is that Congress rationally perceived a [problem] and reacted to that perception in a reasonable way. The statute need not be the best possible reaction to the perception, nor does the perception itself need to be heavily buttressed by evidentiary support. It is enough that the perceived problem is not obviously implausible and the solution is rationally suited to address that problem.").[4] Volkswagen, however, has not plausibly alleged that the Illinois legislature could not have rationally ***perceived*** the existence of a problem with respect to unfair dealer reimbursement for warranty repairs.

Rather, Volkswagen's arguments address the issue of whether, as an empirical matter, Volkswagen previously under-reimbursed its dealers for warranty work. And to that point, the defendants reply by identifying sufficient reasons why it remains conceivable that, prior to the

---

[4] To be sure, facts suggesting that the problem was not real may in some cases be the best available indicia that the legislature could not have plausibly perceived the existence of the problem. But that does not mean that they are sufficient. That is why most challenges to economic regulations on Fourteenth Amendment substantive due process or equal protection grounds fail. That the legislature was factually wrong—whether about the existence of the problem or the best means to solve it legislatively—does not necessarily mean that the legislature acted arbitrarily or with animus. But regardless, here, Volkswagen has not established facts that definitively rule out that, in general or even in only some cases, there could have actually been a problem with dealers being under-reimbursed for performing warranty work.

Multiplier Act's enactment, manufacturers undercompensated dealers for warranty repairs, even in light of Volkswagen's factual allegations:

> Testing companies retained by manufacturers could tend to underestimate actual repair times, either because they have financial incentives for doing so or because they do not accurately capture realistic working conditions at dealers. And there are plenty of reasons why a dealer might not challenge time estimates that it disagrees with, including the administrative burden and a fear of retaliation from the manufacturer. Finally, even if dealers make money from warranty repairs, this does not negate the possibility that manufacturers pay dealers less than they should for those repairs, which in turn causes technicians to be undercompensated for their work.

Defs.' Reply at 7. That the problem was conceivably real provides them an *a fortiori* argument that the Illinois legislature could have perceived the existence of the problem.

With respect to Illinois' technician-under-compensation interest, Volkswagen argues that there is no rational connection between the 1.5x Multiplier Provision and that goal because "the law neither requires nor incentivizes dealers to increase technician pay, rather than simply pocket the windfall the Multiplier Act bestows on them." Pl.'s Resp. at 27. To be sure, the defendant's logic is reasonable; the Multiplier Act may not be the optimal or most direct way of increasing technician pay. But at the same time, Volkswagen goes too far in characterizing Illinois' means of achieving that goal as irrational. It does not fly in the face of reason to conclude that increasing the amounts dealers receive for performing warranty work may result in the employees who perform that work receiving higher pay. It may allow dealers or franchisees, now with greater revenues, to compete for technicians who work at shops that do not perform warranty repairs subject to this legislation (*e.g.*, those who work at EV manufacturer dealerships or at independent repair shops) by raising wages. Again, the legislature "is not obligated to choose the legislative scheme that a reviewing court would find to be the best or fairest means to the legislative end, but simply one that is rationally related to that end." *Midwest Motor Exp., Inc.*, 181 F.3d at 806.

Volkswagen has failed to overcome the presumption in the State's favor on its substantive due process claim. The claim is therefore dismissed.

## II.     Equal Protection

Volkswagen's complaint further asserts that the Multiplier Act violates the Equal Protection Clause because it arbitrarily differentiates between electric vehicle (EV) manufacturers "without dealer networks" and "distributors with dealer networks such as Volkswagen." The differential treatment is that only the latter need to reimburse dealers at 1.5x the rates in their time guides. This is because (at least some) newly established EV manufacturers do not have dealer networks; they may sell and service their vehicles at their own facilities and do not need to reimburse any independently owned franchisees/dealers for warranty repairs using a 1.5x multiplier for a time guide or at any rate at all.

To state a claim based on its equal protection theory, Volkswagen must have "allege[d] facts plausibly suggesting that [it] was 'intentionally treated differently from others similarly situated' and 'there is no rational basis for the difference in treatment.'" *Van Dyke v. Village of Alsip*, 819 Fed. Appx. 431, 432 (7th Cir. 2020) (unpublished) (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).[5] Many of the same principles of the preceding substantive due process analysis apply to Volkswagen's equal protection claim. *See Maguire v. Thompson*, 957 F.2d 374, 376 ("Unless a statute implicates a fundamental right or makes a suspect classification, to withstand fourteenth amendment scrutiny the law must bear only a rational relation to a legitimate state purpose."). "When dealing with local economic regulation, 'it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth

---

[5] There is no suggestion that a suspect classification that would trigger closer scrutiny is involved.

17

Amendment.'" *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1071 (7th Cir. 2013) (quoting *Listle v. Milwaukee Cty.,* 138 F.3d 1155, 1158 (7th Cir. 1998)). It bears mentioning, however, that "[t]he [equal protection] analysis is slightly different than for the due process claim discussed above. Rather than identify a rational reason for infringing on citizens' [ability to do something], we must identify a rational reason for the distinction the ordinance draws between [the two classifications]." *Id.*

The parties spill plenty of ink debating whether legacy manufacturers with dealer networks such as Volkswagen and newer EV manufacturers such as Rivian that do not have dealer networks are similarly situated. But "[t]he debate is unnecessary." *St. Joan Antida High Sch. Inc.*, 919 F.3d at 1010. As the Seventh Circuit has explained:

> Arguments over whether there is an apt "similarly situated" comparator are suited for class-of-one equal-protection cases, in which the individual claimant must show that she was treated differently (and irrationally so) than someone else. But where, as here, the classification appears in the text of the challenged regulation, we do not need to identify a comparator. The regulation that imposes the burden does the work for us.

*Id.* Thus, the analysis collapses into whether there is a rational basis to subject legacy manufacturers with dealer networks to the 1.5x Multiplier Provision but not newer entrants that do not have dealer networks. There is. As laid out in the preceding due process section, it is plausible that the 1.5x Multiplier Provision is aimed at ensuring that dealers and technicians who perform work pursuant to manufacturers' limited warranties are adequately reimbursed and compensated, respectively.[6] Obviously, legislation directed at that purpose would not apply to manufacturers that do not have dealer networks because the reimbursement problem does not exist as to them.

---

[6] Volkswagen also attempts to describe this "singling out" of manufacturers as the ones "taking advantage" of dealers and workers as animus, but it does not develop its argument that identifying a problem purportedly caused by that group can be reasonably construed as animus.

Volkswagen argues, "if the distinctions created by the MVFA itself are set aside, there is no rational basis to distinguish legacy car manufacturers from new EV manufacturers." Pl.'s Resp. at 23. But that is the point; Volkswagen's complaint does not mount a challenge against the MVFA's pre-existing framework regulating manufacturers and franchisee/dealer networks. To the extent that it tries, its complaint and arguments in the briefing are underdeveloped. As the defendants point out:

> Volkswagen is not challenging the constitutionality of the Motor Vehicle Franchise Act to the extent that it requires Volkswagen to sell through dealers, and, in fact, the Attorney General letter that Volkswagen attaches as Exhibit A states that the Act does not require manufacturers to utilize dealerships.

Defs.' Reply at 8, n.1. Indeed, if that is the case, then it is not clear at all that the two classifications—with dealer network and without—are dissimilarly situated *solely* as a matter of regulatory classification. To the extent that the with-dealer-network status is in large part a product of historical business practices, from which newer EV entrants are obviously unbound by virtue of their later entry, and not purely a matter of regulatory classification, then the Court would find that Volkswagen has failed to establish that it is being treated differently from a similarly situated comparator. As far as the Court can surmise, if the newer EV entrants elected to use independent dealer networks, then they would be subject to the same treatment about which Volkswagen complains.

## III.    The Recoupment Bar and Volkswagen's Remaining Federal Constitutional Challenges

Volkswagen argues that the Recoupment Bar violates the Takings Clause because it takes its property without just compensation, and the Commerce Clauses of the U.S. Constitution because it unduly interferes with and/or discriminates against interstate commerce. Both claims

rely on reading the Recoupment Bar to require Volkswagen to absorb increases in costs attributable to the 1.5x Multiplier Provision.

Alternatively, Volkswagen lodges a First Amendment challenge against the Multiplier Act because of the Recoupment Bar's effects on Volkswagen's commercial speech. It is an "alternative" claim because it depends on a different interpretation of the Recoupment Bar than the one underpinning its Takings Clause and Commerce Clause claims. The Court first addresses the First Amendment claim, as the analysis will dispose of the other remaining federal Constitutional claims.

A law that is directed at regulating how sellers communicate their prices to consumers— as opposed to regulating prices and thus *incidentally* affecting communications about those prices—constitutes a burden on commercial speech and warrants First Amendment scrutiny. *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 46-48 (2017). To have standing to challenge a law as unconstitutional under the First Amendment and to seek to enjoin its enforcement prospectively, "[a] plaintiff must show that she has 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution thereunder.'" *Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010) (quoting *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298 (1979); *see also Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464 (7th Cir. 2012) ("To satisfy the injury-in-fact requirement in a pre-enforcement challenge, the plaintiff must show only that she faces 'a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement.'" (quoting *Babbitt*, 442 U.S. at 298)).

Volkswagen's First Amendment theory rests on the following premises: (1) the 1.5x Multiplier Provision increases costs of doing business in Illinois for Volkswagen; (2) Volkswagen

seeks to shift those increased costs onto Illinois consumers by increasing the prices of the vehicles it sells in Illinois; (3) a plausible interpretation of the Recoupment Bar—and one which Volkswagen fears would be invoked in a prosecution or civil action against it—is that it prohibits legacy manufacturers or distributors from communicating to customers that any increases in their prices are attributable to the increases in costs for warranty repairs; (4) Volkswagen has been chilled from communicating to consumers about the nature of the price increases lest it face prosecution or liability under the Multiplier Act for violating the Recoupment Bar; (5) as, therefore, a burden on its commercial speech, the Multiplier Act should be scrutinized under the First Amendment; and (6) it fails First Amendment scrutiny for various reasons.

A.      **Volkswagen's Standing to Assert its First Amendment Claim**

Premises (1)-(4), if accepted, would confer standing on Volkswagen to pursue its First Amendment claim. But the defendants counter that Volkswagen has not adequately alleged that it intends to impose cost recovery measures in Illinois (premise number 4), nor can it show that the statute proscribes the course of conduct that Volkswagen intends to pursue (premise number 3). According to the defendants, "The Recoupment Bar merely regulates the imposition of cost recovery fees or surcharges against franchised auto dealerships; it does not restrict in any way what information Volkswagen may communicate to consumers." Defs.' Memo. at 11, ECF No. 25.

1.      **Whether Volkswagen Intends to Recoup Costs by Increasing Prices and Explain to Consumers the Nature of the Price Increase**

Volkswagen has satisfied its burden of showing that it intends to recover its increased costs for a number of reasons. The increase in its costs is not merely hypothetical; to shift the costs onto consumers is a rational business measure, and to seek to explain the nature of the surcharge is also entirely rational. It is therefore easily inferable from the complaint that Volkswagen has the requisite intent to engage in the behavior that it fears is proscribed, and the Court may take notice

of Volkswagen's intent as inferred from those basic premises and its statements to that effect in its briefing.

> ### 2. Whether the Multiplier Act's "Recoupment Bar" Actually Prohibits Volkswagen's Intended Course of Conduct and Thereby Enables Standing

"It is a threshold requirement to establish a credible threat of enforcement that the statute actually cover the plaintiff's desired conduct." *Indiana Right to Life Victory Fund v. Morales*, 66 F.4th 625, 630 (7th Cir. 2023), *certified question answered,* 217 N.E.3d 517 (Ind. 2023). The Court is persuaded that Volkswagen lacks standing on its First Amendment claim because the Recoupment Bar does not actually proscribe Volkswagen's desired course of action—*i.e.*, telling consumers that it is increasing prices to recover costs associated with complying with the Multiplier Act.

"Manufacturers are not permitted to impose any form of cost recovery fees or surcharges against a franchised auto dealership for payments made in accordance with this Section." 815 ILCS 710/6(b). The statute does not define "cost recovery fees" or "surcharges." The broadest possible reading of this provision is that manufacturers may not recover costs incurred due to the warranty reimbursement requirements by adjusting prices or imposing extra fees in Illinois. A narrower reading is that manufacturers may adjust prices across the board in Illinois to recoup the increased warranty reimbursement costs but may not verbally attribute any increases to Section 6's reimbursement requirements. The narrowest reading, and the one urged by the defendants, is that the provision allows increases in wholesale prices and/or the issuance of surcharges in Illinois, as long as they are applied across the board and not just on certain dealers receiving 1.5x multipliers on Volkswagen's time guides. In other words, the narrowest reading is that the provision bars manufacturers from differentiating between Illinois dealers with whom they have not entered into time guide agreements (and for whom the 1.5x Multiplier Provision therefore applies), from those

22

with whom they have entered into such agreements and charging the former group of dealers with fees or surcharges to recover costs attributable to the 1.5x multiplier from them only. Volkswagen's complaint asserts Takings Clause and Commerce Clause violations based on the first interpretation of the Recoupment Bar above and, alternatively, a First Amendment violation if the Court adopts the second. The parties agree that the first (broadest) and third (narrowest) interpretations raise no First Amendment issues. Indeed, Volkswagen does not seem to assert that the third interpretation poses *any* federal constitutional issues. The parties only dispute which interpretation the Court should adopt.

The Court cannot simply credit the defendants' position that Volkswagen does not face a credible fear of prosecution because the Secretary of State will not enforce the statute in the manner Volkswagen fears. In *Indiana Right to Life Victory Fund v. Morales*, the Seventh Circuit explained that a district court cannot rely on a state official's disavowal of her intent to enforce a statute based on her narrower interpretation of the statute unless the broader construction of the statute challenged by the plaintiff is plainly unconstitutional. 66 F.4th at 630-31.[7] The defendants have not asserted that the alternative reading of the Recoupment Bar on which Volkswagen bases its First Amendment claim is plainly unconstitutional. Since there is no Illinois case law addressing the scope of the Recoupment Bar, and the Court is not empowered to certify the question of the statute's interpretation to the Illinois courts, Ill. Sup. Ct. R. 20(a) (permitting only the U.S. Supreme Court or U.S. Court of Appeals for the Seventh Circuit to certify questions of law to the

---

[7] "State officials' affirmative expressions of intent to enforce a statute may certainly give rise to a credible threat. So would state officials' refusals to disavow enforcement when given the opportunity to do so. But state officials' promises not to enforce a statute receive less weight, especially when they cannot bind their successors in office. It is only when a state agency acknowledges that it will not enforce a statute because it is plainly unconstitutional that such statements might mean anything at all." *Id.* at 631 (cleaned up).

Illinois Supreme Court), the Court must use Illinois' methods of statutory interpretation to determine whether it covers Volkswagen's intended conduct.

### 3. Interpretation of the Recoupment Bar

In interpreting the Recoupment Bar, the Court's task is to predict how the Illinois Supreme Court would interpret it. *Frye v. Auto-Owners Ins. Co.*, 845 F.3d 782, 786 (7th Cir. 2017); *In re Hernandez*, 918 F.3d 563, 569 (7th Cir. 2019). Thus, the Court defers entirely to Illinois' principles of statutory interpretation, which, as the Illinois Supreme Court has recently elucidated, are as follows:

> The most fundamental rule in statutory construction is to give effect to the legislative intent. The statutory language, given its plain and ordinary meaning, is generally the most reliable indicator of that legislative intent, but a literal reading must fail if it yields absurd, inconvenient, or unjust results. Words and phrases should not be considered in isolation; rather, they must be interpreted in light of other relevant provisions and the statute as a whole. In addition to the statutory language, the court may consider the purpose behind the law and the evils sought to be remedied, as well as the consequences that would result from construing the law one way or the other.

*State ex rel. Raoul v. Elite Staffing, Inc.*, 2024 IL 128763, ¶ 16, *reh'g denied* (Mar. 25, 2024) (cleaned up). "Additionally, a court presumes that the legislature intended to enact a constitutional statute. Accordingly, a court will construe a statute as constitutional, if it is reasonable to do so.  If a statute's construction is doubtful, a court will resolve the doubt in favor of the statute's validity." *Bonaguro v. Cnty. Officers Electoral Bd.*, 634 N.E.2d 712, 714 (Ill. 1994). Finally, "a court is not bound by an administrative agency's interpretation of a statute. However, a court will give substantial weight and deference to an interpretation of an ambiguous statute by the agency charged with the administration and enforcement of the statute. Such an interpretation expresses an informed source for ascertaining the legislative intent." *Id.* at 715.

Based on these principles, the Court ultimately adopts the defendants' proposed interpretation of the statute—namely, that the provision bars manufacturers from differentiating Illinois dealers with whom they have not entered into time guide agreements (and for whom the 1.5x Multiplier Provision therefore applies), from those with whom they have entered into such agreements, through the issuance of extra fees or surcharges. Three primary reasons support this outcome. First, it is the interpretation that is in greatest harmony with the overall statutory scheme and legislative intent, and it does not contradict any of the statute's plain language. Second, it accords appropriate deference to the interpretation of the statute endorsed by the agency charged with enforcing it (the Secretary of State's Office). And third, the defendants' interpretation avoids any constitutional questions.

With respect to the legislature's intent, as previously discussed, Illinois courts have instructed that "Section 6, as a whole, pertains to automotive warranty agreements and warranty repairs, and attempts to strike a balance regarding the issue of reimbursement as between manufacturers that sponsor these agreements and their dealers that are required to complete the repairs." *Nissan N.A., Inc*, 7 N.E.3d at 28 (prior to the 2022 enactment of the Multiplier Act). The Court does not see, nor do the parties raise, any reason to depart from that broader characterization of Section 6's aims in light of the Multiplier Act's changes to the Section. Accordingly, the Court will use that general lodestar in interpreting the statute, including the Recoupment Bar provision.

The defendants' non-differentiation interpretation is the one that aligns most closely with the legislative intent of "striking a balance" in terms of warranty reimbursements to dealers. As the defendants explain, for warranty repairs, the Multiplier Act herds manufacturers and dealers into two camps: (1) those who agree on a third-party time guide and (2) those who do not, and who must therefore rely on the manufacturer's time guide times 1.5. They proceed:

> These are supposed to be equivalent options; the so-called 'multiplier' reflects the legislature's determination that manufacturers' time guides tend to understate actual repair times by about 50%. It follows that dealers relying on the multiplier should not be penalized relative to their counterparts that agreed on a third-party time guide.

Reply at 14. Thus, the Recoupment Bar, by "prevent[ing] a two-tier pricing system based on whether or not a dealer was able to agree with the manufacturer on a third-party time guide," *id.* merely ensures that the balance that the Illinois legislature intended to strike is met.

The two broader interpretations of the Recoupment Bar that Volkswagen challenges go beyond that purpose. The broadest one—that manufacturers may not recover costs imposed by the warranty reimbursement requirements by adjusting prices or imposing extra fees in Illinois—would make Volkswagen absorb the costs of any increase in reimbursements (thus a true "recoupment bar"). The broadest reading introduces a cost-shifting (from consumers to manufacturers) appendage to Section 6 that is largely unrelated to the issue of whether dealers are fairly reimbursed for warranty repairs. But there is no reason to think that it quite mattered to the legislature which group on either end of the stream—manufacturers or consumers—absorbs the costs, as long as dealers are reimbursed for warranty repairs at the level that the legislature deemed appropriate. Therefore, that reading is less persuasive from a legislative intent standpoint, which is crucial to statutory interpretation under Illinois law. The slightly narrower interpretation, which implicates Volkswagen's commercial speech, permits Volkswagen to recoup its costs by raising invoice prices across the board but entails the entirely speculative hypothesis, with no textual underpinning, that the legislature sought to bar Volkswagen from explaining the reasons behind the price increase to customers.

The defendants' interpretation is consistent with the plain language of the Recoupment Bar: "Manufacturers are not permitted to impose any form of cost recovery fees or surcharges

against a franchised auto dealership for payments made in accordance with this Section." 815 ILCS 710/6(b) (emphasis added). The lack of any language about wholesale prices seems to preclude the reading that Volkswagen cannot raise its wholesale prices as a result of increased costs. There were, to be sure, many more broadly written reimbursement bars in other states that the Illinois legislature could have followed had they wished to be more restrictive. Consider Maine, for example, which has a long history of dealing with the "considerable friction" caused by disputes over warranty reimbursement rates, *All. of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 33 (1st Cir. 2005), and its much broader version of the recoupment bar relating to warranty reimbursements, Me. Rev. Stat. Ann. Tit. 10, § 1176 ("A franchisor may not otherwise recover its costs for reimbursing a franchisee for parts and labor pursuant to this section."). In 1995, prior to the enactment of Maine's recoupment bar, the Ford Motor Company prevailed over dealers in *Acadia Motors, Inc. v. Ford Motor Co.,* 44 F.3d 1050, 1055-57 (1st Cir. 1995), which involved a challenge to its ability to increase prices to recoup costs for complying with Maine's reimbursement requirements. The First Circuit held:

> Nothing in the language of § 1176 prohibits a manufacturer from increasing vehicle prices in order to recover its increased compliance costs. The statute says nothing about wholesale or retail prices, and apparently leaves the manufacturer free to increase wholesale prices, and the dealer to increase retail prices. The legislative history of the amended statute also does not indicate that the Maine legislature intended to set price controls or to force manufacturers to wholly bear the costs of compliance. Moreover, as Ford points out, it is quite commonplace for manufacturers and other regulated entities to pass on to retailers and consumers their costs of complying with regulatory statutes.

*Id.* at 1056. Following *Acadia Motors, Inc.*, the "the Maine legislature . . . amended section 1176 by providing in pertinent part that a motor vehicle manufacturer 'may not otherwise recover its cost for reimbursing a [dealer] for parts and labor pursuant to this section.'" *Gwadosky*, 430 F.3d at 33 (quoting Me. Rev. Stat. Ann. Tit. 10, § 1176). The First Circuit determined that this

broad version of the Recoupment Bar constituted a prohibition against "state-specific surcharges to wholesale motor vehicle prices in order to recoup the costs of their compliance with retail-rate reimbursement laws." *Id.* at 32 (affirming district court's judgment that Maine's recoupment bar did not violate the Commerce and Contracts Clauses of the U.S. Constitution). It is notable how much broader Maine's language is, and it is a likelihood that Illinois' legislature was capable of surveying the breadth of language used by various states' recoupment bars in arriving at one that is not nearly as broad.[8]

---

[8] Maine is not the only example, by a long shot. For examples of how various other states formulate their "recoupment bars" to achieve various ends—some broader, like Maine's, and others more limited—see Conn. Gen. Stat. § 42-133s(g) ("A manufacturer or distributor may not otherwise recover its costs from dealers within this state, including an increase in the wholesale price of a vehicle or surcharge imposed on a dealer solely intended to recover the cost of reimbursing a dealer for parts and labor pursuant to this section, provided a manufacturer or distributor shall not be prohibited from increasing prices for vehicles or parts in the normal course of business."); Fla. Stat. § 320.696(6) ("A licensee shall not recover or attempt to recover, directly or indirectly, any of its costs for compensating a motor vehicle dealer under this section."); Ga. Code Ann. § 10-1-641(c) ("[A] franchisor, manufacturer, or distributor shall not recover its costs from dealers within this state, including a surcharge imposed on a dealer solely intended to recover the cost of reimbursing the dealer for parts and labor pursuant to this Code section, provided that a franchisor, manufacturer, or distributor shall not be prohibited from increasing prices for vehicles or parts in the normal course of business."); Idaho Code § 49-1626(13) (" A manufacturer [or distributor] may not otherwise recover all or any portion of its costs for compensating its dealers licensed in this state for warranty parts and labor either by reduction in the amount due to the dealer or by separate charge, surcharge or other imposition; provided however, a manufacturer or distributor shall not be prohibited from increasing prices for vehicles or parts in the normal course of business." (alteration in original)); N.C. Gen. Stat. § 20-305.1(b) ("[I]t is unlawful for any motor vehicle manufacturer . . . to otherwise recover all or any portion of its costs for compensating its motor vehicle dealers licensed in this State for warranty or recall parts and service . . . either by reduction in the amount due to the dealer, or by separate charge, surcharge, or other imposition . . ."); N.M. Stat. Ann. § 57-16-7(I) ("A manufacturer may not recover its costs for compensating its dealers licensed in this state for a recall or warranty claim either by reduction in the amount due to the dealer or by separate charge, surcharge, or other imposition."); Utah Code Ann. § 13-14-201(1)(jj) (unlawful to "impose any fee, surcharge, or other charge on a franchisee designed to recover the cost of a warranty repair for which the franchisor pays the franchisee."); Vt. Stat. Ann. Tit. 9, § 4086(b) ("A manufacturer may not otherwise recover all or any portion of its costs for compensating its motor vehicle dealers licensed in this State for warranty parts and service either by reduction in the amount due to the dealer or by separate charge, surcharge, or other imposition.."); Va. Code Ann. § 46.2-1571(B)(5) (unlawful for a manufacturer to "[f]ail to

Next, the defendants' interpretation of the MVFA is entitled to some deference given that the defendants include the state official charged with enforcing it (the Secretary of State) and the Board that the Secretary of State administers to hold hearings under the act. *See BCS Ins. Co. v. Guy Carpenter & Co., Inc.*, 490 F.3d 597, 602 (7th Cir. 2007) ("[W]hen we are faced with an area of particular importance to the state, we may seek the advice of the state officer charged with the administration of that state statute to aid in our determination . . . . Consequently, we give some deference to the state officer's interpretation of the statute in question."); *Nissan N.A., Inc. v. Motor Veh. Rev. Bd.*, 7 N.E.3d 25, 33 (Ill. App. 1st Dist. 2014) ("[I]n instances where statutory ambiguities must be resolved or there is reasonable debate about a statute's meaning, the [Motor Vehicle Review] Board's determination is wholly relevant.") (construing the MVFA); *see also* 815 ILCS 710/19, 22, 28 (noting that the Secretary of State is charged with administering the MVFA and applying, through the Attorney General, for an injunction to be issued by the circuit court where it appears that a person is violating the Act). Finally, the Court notes that, as Illinois principles demand, there is a preference for interpreting the statute in the manner that avoids unconstitutionality. Without deciding that the other interpretations are necessarily unconstitutional, the parties seem to agree that the defendants' interpretation does not raise any constitutional issues. That is some evidence that it is the correct interpretation of the Recoupment Bar.

---

fully compensate its motor vehicle dealers licensed in the Commonwealth for recall or warranty parts, work, and service pursuant to subsection A either by reduction in the amount due to the dealer or by separate charge, surcharge, or other imposition by which the motor vehicle manufacturer, factory branch, distributor, or distributor branch seeks to recover its costs of complying with" the section of the statute dealing with warranty reimbursements); Wash. Rev. Code § 46.96.105(4) ("A manufacturer may not otherwise recover all or any portion of its costs for compensating its dealers licensed in this state for warranty parts and service either by reduction in the amount due to the dealer or by separate charge, surcharge, or other imposition.").

For these reasons, the Court concludes that the Recoupment Bar does not prohibit Volkswagen or other manufacturers from raising prices in Illinois to recover the costs of their vehicles or identifying or classifying any price increases as recoveries for costs associated with complying with the Multiplier Act's warranty reimbursement rules. Accordingly, Volkswagen's intended conduct is not prohibited by the Recoupment Bar, and it therefore lacks standing to assert its First Amendment claim.

### B.     Effect on Volkswagen's Takings Clause and Commerce Clause Claims

Volkswagen's takings and dormant commerce clause claims both rely on an interpretation of the Multiplier Act rejected above, *i.e.*, that it prohibits cost recovery in the form of increased wholesale prices. Given that Volkswagen may recoup its increase in costs by increasing its prices, the Multiplier Act does not (1) effect an uncompensated taking any more than, for instance, an increase in minimum wage would; (2) discriminate against interstate commerce by making it more difficult for dealers in neighboring states to compete with Illinois dealers because prices will presumably rise in Illinois, or (3) burden interstate commerce by forcing Volkswagen to raise its prices outside of Illinois to recoup its increased costs for doing business within Illinois. Therefore, those claims are also dismissed for lack of standing.

*     *     *

For the foregoing reasons, the defendants' motion to dismiss Volkswagen's complaint is granted. Volkswagen's claim is dismissed without prejudice. Volkswagen's due process and equal

protection theories fail to state a claim for relief and Volkswagen lacks standing to assert its claim

for relief under its First Amendment, takings, and dormant commerce clause theories.


Dated: May 6, 2024

_____

John J. Tharp, Jr.
United States District Judge